**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case Number: 26-MJ-163** |
| | : | |
| **KOOPER THURSTON,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM**
**IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Memorandum in support of its Motion for Pretrial Detention of Defendant Kooper Thurston under 18 U.S.C. §§ 3142(f)(1)(A). The defendant has been charged by Criminal Complaint in the United States District Court for the District of Columbia with a crime of violence, Travel with Intent to Engage in Illicit Sexual Conduct, in violation of Title 18 United States Code § 2423(b). Defendant traveled from Washington, D.C. to Arlington, VA with the intent to sexually abuse a 7-year-old child. Given the egregiousness of his conduct, the government submits that there are no conditions that will reasonably assure the safety of the community should he be released. As a result, detention is appropriate.

## FACTUAL BACKGROUND

On Monday, September 14, 2026, a Federal Bureau of Investigation (FBI) Washington Field Office (WFO) Task Force Officer (TFO) was acting in an undercover capacity (UC) as part of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. In that capacity, the UC entered a social media platform known to the UC as a place where people meet to discuss various fetishes among other things. The application is a privacy-oriented, anonymous social

media app for sharing, venting, and connecting in a less identity-driven way. It allows you to engage in communities, post and reply anonymously, choose connections nearby or globally, and focus more on content than persona.

While in this platform the undersigned posted messages in several groups that he was a member of. The majority of these groups are taboo in nature and involve incest related discussions among other things. A user using the screen name, "diapysoup" with a profile indicating that he was a 19-year-old male from Washington, D.C. initiated a private chat with the undersigned. This person was subsequently identified as Kooper Thurston.

Mr. Thurston sent the following message to the UC while in the Fetish website, "I'd love to hear all your nasty taboo thoughts." Mr. Thurston further stated, "I'm very open, love incest. I live alone my family all lives about 10 hours away but back home my mom and dad are separated." After briefly communicating within this application, the UC and Mr. Thurston moved to the Session application that same day.[1] The following is a portion of that chat conversation:

UC: So what do u enjoy perving too? Any family experiences.

THURSTON: Mainly my mom. My experiences are peeping in her/fingering my lil sis once but that's it.

UC: Mmmmm how old is she

THURSTON: She is 43 my lil sis was 10 I was 12

UC: You ever get any good peeks on them

THURSTON: Yeah my mom. Her tits ass and pussy

1 Session is a privacy-focused, encrypted messaging application that allows users to communicate and transmit messages, photographs, and videos through unique account identifiers without requiring a telephone number or email address.

Continuing the conversation on September 14, 2026, the UC informed Mr. Thurston that he is a dad with a purported 7-year-old daughter and divorced from his wife. Thurston expressed in interest in the UC's relationship with his purported daughter stating, "I wanna hear more about all you have done and would do to your daughter, it turns me on so much."

During the course of the chat the UC and Thurston discussed videos. The following is a portion of that conversation:

UC: You in any good groups here? What kinna vids make u cum

THURSTON: I wish but no groups, a lot of vids make me cum especially older and younger together.

UC: Mmmm yes love that

UC: What's the youngest with older that u have seen?

THURSTON: Not sure maybe like 12

THURSTON: But idc I'll watch what you send

Later in the chat the discussion of videos continued. The following is a portion of that conversation:

THURSTON: Also, I know you were mentioning videos, did you have any to send?

UC: I can look and see if I still have them saved.

UC: What about u, do u have any young and naughty vids

THURSTON: I don't sadly

UC: Ah ok, yeah I typically share with people who have stuff

THURSTON: Awe damn. Well we are both in DC. Maybe I can do one better and come see them and that daughter of yours (devil face emoji)

UC: I would be down for that if your serious, of course we have to keep it on the down low.

THURSTON: Absolutely can keep it down low

THURSTON: I'm serious if you're down

UC: Yeah totally I get her every other week

UC: What days are typically good for you

THURSTON: Tuesday, Thursday, Friday weekends

UC: Ok cool, that works for us

THURSTON: What all would we do? I want to make sure I respect your wishes

UC: Yeah, so I don't fuck her because she is still to tiny and don't want any issues, I am open to you doing other stuff with her if that's something your interested in and would want to do

THURSTON: Fuck I'd love to eat that pussy. Then maybe have her suck and stroke me then I could cum wherever you'd like

UC: Yes totally cool with that, I actually think it would be rally hot to see her with a strange cock

THURSTON: Fuckkkkk yeah I cant wait. What time or day works best for you? I have no classes on Tuesdays

UC: Ok, next Tuesday may work not tomorrow but the following if that's good with you, either day or evening. I'll figure out a time once we get closer.

THURSTON: Perfect

THURSTON: She's probably got the best pussy. You're raising her as the best slut I hope you fuck her soon.

UC: OMG its soooooo soft and bald

THURSTON: Fuckkkk you're strong for not filling her up yet.

UC: I know, I mean I have rubbed my head around and pressed a bit but nothing crazy yet

THURSTON: Would you mind if I did that? Obliviously I want her own father to deflower her so I wouldn't even try lol.

UC: Yeah, I'm cool with you rubbing it around

UC: Your clean right? No STD?

THURSTON: Yes sir

UC: Sweet

THURSTON: When do you think you'll break the seal on it and finally take your daughter's virginity

UC: I'm Thinking when she is 8

THURSTON: Fuck yeah. I'd love to watch the first time, I'm sure you'll cum quick

UC: OMG so quick

During the course of the chat THURSTON discussed the sexual things he wanted to do with the UC's purported minor daughter. The following is a portion of that conversation:

UC: So once we all meet up is their anything else you want to do besides eating her pussy and blow job?

THURSTON: Make out, cum all over her, maybe finger?

UC: Yes, totally good with all of that

THURSTON: Fuck yes

THURSTON: I'll also want to rub my tip all over her pussy and I hope she looks right at you while servicing my cock.

The chat continued, the following is a portion of that conversation:

UC: So I almost did this once with another guy but he freaked out when he saw her, so I want to make sure that you are 100% comfortable with the situation being that she is 7.

UC: Im not into fantasy at all so I just want to make sure that you know this is legit and real before you commit

UC: My big thing is being careful and trusting the person

UC: Just let me know either way

THURSTON: Yeah I understand I'm comfortable with the idea for certain. I just worry about verifying that its actually legit like

On September 15, 2026, the UC and Mr. Thurston discussed validation—how to ensure that both were serious about their plan to meet. The UC sent THURSTON a pair of his daughter's purported panties with the requested name of "Stephan" on a piece of paper next to the panties. Mr. Thurston sent the UC an image of his underwear with the name, "Jon" written on a health care mask. Mr. Thurston informed the UC that he would bring those same items with him at the meet.

That same day, the UC exchanged cellular phone numbers with the defendant. The defendant used the cellular number 839-400-XXXX. A law enforcement database check revealed that the number belonged to Kooper Thurston. During the course of the chat the UC informed Mr. Thurston that his purported ex-wife was going out of town and he would have access to his purported daughter at his ex-wife's home in Virginia on September 17, 2026.

On September 15, 2026, the UC and Mr. Thurston continued their chat via text message. During the course of the cellular chat Mr. Thurston agreed to meet at the Crystal City Metro stop in Arlington, VA on Thursday, September 17, 2026, for the purpose of Mr. Thurston to engage in sexual conduct with the UC's purported 7-year-old daughter.

On September 17, 2026, at approximately 3:30 pm, Mr. Thurston informed the UC that he

was finished with his college class and heading to the metro. The UC was waiting at the prearranged location at the exit of the Crystal City, Virginia Metro Station. At approximately 4:00 pm, Mr. Thurston arrived and met the UC. The UC exchanged pleasantries with Mr. Thurston, and then pointed to a nearby apartment building and informed Mr. Thurston that is where his daughter lives. Mr. Thurston stated "ok" and began walking in the direction of the apartment building with the UC. As the UC was walking, he gave a prearranged signal to the arrest team, and Mr. Thurston was placed under arrest.

A cursory search of Mr. Thurston revealed an iPhone, a medical mask with the UC's name on it, and a pair of underwear. Mr. Thurston produced a Government ID bearing the name, Kooper Thurston. Mr. Thurston was transported to the WFO FBI for processing.

Mr. Thurston waived his Miranda rights and provided a statement. Mr. Thurston admitted that he traveled from Washington D.C. via Metro to Virginia for the purpose of meeting with the UC and his purported daughter. Once Mr. Thurston was questioned about the sexual comments he made in the chat, he requested a lawyer, and the interview ceased.

## ARGUMENT

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence.

The crime Travel with Intent to Engage in Illicit Sexual Activity, in violation of Title 18 United States Code § 2423(b), is a crime of violence involving a minor victim, which under 18

U.S.C. § 3142(e)(3)(E) creates a rebuttable presumption that the defendant constitutes a danger to the community, and that no pretrial release condition or combination of conditions may be imposed to assure the safety of any other person and the community. This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released").

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it

outside 'the congressional paradigm.'").

## ANALYSIS

For the reasons that follow, the government submits that there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community, and that the defendant should therefore remain detained pending trial.

### A. The Nature and Circumstances of the Offense Charged

The nature and circumstances of the offense in this case are extremely serious and weigh in favor of detention. The defendant communicated with a man whom he believed was sexually abusing his seven-year-old daughter. He told the man, "I wanna hear more about all you have done and would do to your daughter, it turns me on so much." The defendant also stated that he has watched child pornography. Then, when discussing videos, defendant brought up the idea of seeing the man's daughter. Defendant stated explicitly what he would like to do to the 7-year-old, including: kissing her, ejaculating on her, and penetrating her digitally. He also expressed interest in watching the man—her purported father—abuse her and "deflower" her. Defendant then made arrangements to travel to Arlington, Virginia to see the 7-year-old and sexually abuse her. He did not express any hesitation or apprehension in doing so. This was not a mere fantasy—when the UC stated, "I'm not into fantasy at all so I just want to make sure that you know this is legit and real before you commit," the defendant responded: "Yeah I understand I'm comfortable with the idea for certain." Defendant described the abuse he was going to engage in and then took concrete steps to carry out that abuse.

In other similar cases in this District, the defendant was detained pending trial. For example, in *United States v. Holley*, defendant was arrested in very similar circumstances: he had been speaking with a UC online, made plans to travel and meet the UC and his purported 9-year-

old daughter, and when they met in Washington D.C., the defendant was arrested. *United States v. Holley*, Crim. A. No. 25-292 (EGS), 2025 WL 3507180, at *1-*3 (D.D.C. Dec. 3, 2025). The Magistrate Judge in that case released the defendant into the High Intensity Supervision Program, but that decision was reviewed by the Chief Judge and reversed. The calendar Judge also heard the issue and affirmed defendant's detention pending trial. *Id.* at *3. Specifically, the Court noted that the defendant "took the affirmative, unequivocal step of driving his vehicle into the District of Columbia to arrive at the appointed time and place," and "but for the fact that defendant was communicating with an undercover officer, defendant could have come fac[e]-to-face with a minor and a willing parent." *Id.* at *5 (quoting *United States v. Breeden,* No. 15-MJ-0506, 2015 WL 13310427, at *7 (D.D.C. Nov. 16, 2015)). The Court gave particular weight to the fact that Holley confirmed it was not a fantasy. Here too, Mr. Thurston took the affirmative step of taking the metro to Arlington, Virginia, and but for the fact of meeting with an undercover officer, he would have met a minor and a willing parent. And, Mr. Thurston also confirmed that this was not a mere fantasy for him—he expressed no hesitation and stated that he was comfortable with the idea.

The *Holley* Court also noted that it was aware of only one case in which a defendant charged with the same offense was released, *United States v. Oglesbee*, No. 22-cr-177. However, in that case, the defendant had a medical condition that placed him at high risk for complications from COVID-19, which is not at issue with Mr. Thurston. In all other cases where the defendant was charged with the same offense, they were detained. *Id.* at *5 (citing *United States v. Breeden,* No. 15-MJ-0506, 2015 WL 13310427, at *1 (D.D.C. Nov. 16, 2015); *United States v. Beauchamp-Perez,* 822 F. Supp. 2d 7, 10 (D.D.C. 2011); *United States v. Johnston,* No. 17-MJ-0046, 2017 WL 4326390, at *4 (D.D.C. Sept. 28, 2017); *United States v. Brockerman,* No. 25-cr-133 (Moss, J.); *United States v. Scott*, No. 24-cr-287, 2024 WL 3887394 (D.D.C. Aug. 21, 2024)).

In sum, the defendant attempted and intended to repeatedly sexually exploit and abuse a 7-year-old girl. Thus, the nature and circumstances of the offense weigh in favor of detention.

**B. <u>The Weight of the Evidence Against the Defendant</u>**

The weight of the evidence against the defendant is very strong and weighs in favor of detention.

A district court must consider the weight of the evidence when assessing whether the defendant is a danger or poses a risk of flight and has broad discretion to determine the relative weight of each of the four Bail Reform Act factors. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *9 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) ("First, nothing in the BRA's text requires or alludes to a differing weighing of the factors nor any hierarchy among the factors."). No factor is categorically of greater or lesser weight than the others. As the Second Circuit Court of Appeals observed:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant. See generally 18 U.S.C. § 3142(g). That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

*United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022). In *Zhang*, the Second Circuit found that the district court gave appropriate weight to the second factor – the weight of the evidence – in determining that there was "significant evidence" that Zhang had in fact committed the charged murder. *Id.* at 150-51. Affirming the district court's relative reliance on the weight of the evidence in determining dangerousness, the court explained:

> In making a predictive assessment of the defendant's future dangerousness

> if released into the community, common sense and § 3142(g)(2) aligned with the district court's consideration of the strength of this evidence, especially coupled with the nature of the charged offense. It stands to reason that the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail.

*Id*. The *Zhang* court's analysis has been cited approvingly in the District Court of the District of Columbia in *Blackson*, and its analysis holds true here as well. *Blackson*, 2023 WL 1778194, at *9-10.

The evidence against the defendant is strong, involving electronic communications in which the defendant repeatedly describes the sex acts that he wants to perform on the 7-year-old child. These chats were recorded and saved by the UC. Additionally, the UC and defendant exchanged phone numbers, and they texted each other. The phone number the UC was chatting with came back to a Kooper Thurston, and those messages were similarly saved by the UC. Mr. Thurston texted the UC updates as to his location, including that he had gotten out of class in D.C., boarded the metro, and then exited the Crystal City metro station. When the two met, the UC told defendant that his daughter was in an apartment building near the metro, pointing towards a building, and the two of them started to walk in that direction. After Mr. Thurston was arrested, he waived his *Miranda* rights and told the officers that he did speak with the UC online and that he traveled from D.C. to Virginia to meet him.

Thus, this factor weighs in favor of detention.

### C. <u>The History and Characteristics of the Defendant</u>

The government acknowledges that Mr. Thurston does not have any criminal history. However, the absence of prior criminal convictions is not sufficient to rebut the statutory presumption of dangerousness on the facts of this case. *See, e.g.*, *United States v. Breeden*, 2015

WL 13310427, at *7 (D.D.C. Nov. 16, 2015) ("But the inferences the defendant is asking the Court to draw do not go far enough. The Court is not certain that a lack of more incriminating evidence constitutes 'evidence' that rebuts the presumption arising from the undisputed facts of the case." (emphasis in original)); *Pope v. United States*, 739 A.2d 819, 826 (D.C. 1999) (explaining that, under the D.C. Code's rebuttable presumption, if a court makes the requisite finding that a defendant committed certain crimes, then the "defendant is presumed to be dangerous (and subject to preventive detention) even if his prior record is clean and if no other showing of dangerousness is made").

While the defendant has no criminal history, defendant's characteristics weigh in favor of detention. First, in the chats, he stated that he has watched child pornography, with potentially 12-year-old children, although he was interested in younger children as well. Second, he stated in the chat that he has, in the past, surreptitiously watched his mother while she was undressed, and that he sexually abused his sister when she was 10-years-old. Third, he expressed satisfaction and encouragement to a purported father abusing his 7-year-old daughter.

All this, taken together, show that defendant is willing to act on his sexual interest in children, not merely watch it on a screen.

**D. The Nature and Seriousness of the Danger to Any Person or the Community**

Finally, the evidence here establishes that the defendant presents a danger to the community. The charged conduct demonstrates an extraordinarily serious and specific danger: he traveled across state lines for the purpose of sexually abusing a 7-year-old child. This demonstrates a willingness and ability to seek out and sexually exploit a vulnerable child. Further, this was not merely an offense that occurred opportunistically in the defendant's ordinary environment.

Defendant was the one who initiated the meet up, and he then took the step of taking public transportation to follow through with the intended plan.

While the government at the time of this filing does not know who the defendant will proffer as a potential third-party custodian, his mother is not an appropriate placement. In this case, Mr. Thurston stated to the UC that he had experience "peeping" his mother when she "was showering" and "she never caught me." He stated that "she would also walk around naked a lot and forget I was home." Because he regularly engaged in sexually exploitative conduct while living with his mother, any placement with her would not prevent future misconduct.

## CONCLUSION

For all of the reasons set forth above, and any other reasons set forth at any hearing on this issue, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the defendant has not rebutted the statutory presumption in favor of detention, and should be detained pending trial.

WHEREFORE, the government respectfully requests that the court grant its motion for detention of the defendant.

Respectfully submitted,

JEANINE F. PIRRO
UNITED STATES ATTORNEY

By: */s/ Trisha Jhunjhnuwala*
Trisha Jhunjhnuwala
DC Bar No. 888155333
Assistant United States Attorney
United States Attorney's Office
601 D St., N.W.
Washington, DC 20530
Phone: (202) 740-3206